# EXHIBIT B

B"H



THE ALEPH INSTITUTE

NATIONAL HEADQUARTERS
9540 Collins Avenue, Surfside, FL 33154
Phone: (305) 864-5553

WEST COAST BRANCH
4221 Wilshire Blvd, #170-6
Los Angeles, CA 90010
Phone: (424) 210-3685
www.aleph-institute.org

**Rabbi Yossi Bryski**
ybryski@aleph-institute.org

**Chairman / Founder**

Rabbi Sholom D. Lipskar

**President**

Lloyd S. Rubin

**Board of Directors**

Robert Danial

Boruch Duchman

Joy Fishman

Stephen Fiske

Russel Galbut

Reuven Herssein

Daniel M. Holtz

Alberto Kamhazi

Sonny Kahn

Rabbi Aaron Lipskar

Rabbi Sholom D. Lipskar

Morris Mendal

Lloyd S. Rubin

David Schottenstein

Ryan Shapiro

Eric Stein

Sylvia Urlich

**Executive Director**

Rabbi Aaron Lipskar

**Director of Operations**

Moshe N. Barouk

**Director of Outreach Programs**

Rabbi Menachem M. Katz

**Director of Military Programs**

Rabbi Sanford L. Dresin

**Director of Advocacy**

Rabbi Zvi Boyarsky

**Director of Outreach Programs**

Rabbi Shua Brook

**Chief Financial Officer**

Yosie Lipskar

☘    ☘    ☘

**Programs Coordinator**

Moshe Blizinsky

**Prisoner Services Coordinators**

The Honorable Denise L. Cote
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

January 22, 2021

Re:    *United States v. Benzion Zirkind, Case No.19-CR-463*

Dear Judge Cote:

On behalf of The Aleph Institute ("Aleph"), I write to respectfully request that you consider the following proposal as you prepare to sentence Benzion Zirkind ("Bentzy"). Aleph is a nonprofit organization that provides support and rehabilitation to thousands of individuals who are enmeshed in the criminal justice and penal systems. We work closely with courts, federal and state lawmakers, law professors, and penal experts towards our common goal of achieving outcomes that promote justice, lessen the burden on shared penal resources, reduce recidivism, and benefit offenders, together with their families and communities. We take seriously our mission, which was eloquently summarized by former FBI director and retired U.S. District Judge Louis Freeh as "championing and delivering justice to people who have been overlooked or forgotten by the rule of law, giving them hope, relief from suffering and the chance to improve their lives and fortunes."[1]

This letter has two interconnected goals. The first is to help you develop a complete and accurate understanding of who Bentzy is as a person. As Aleph's Alternative

---

[1] As discussed *infra*, there are four appendices included with this memorandum. The full quote can be found in Appendix B: *Comments on Aleph and Alternative Sentencing,* at 3.

B"H



THE ALEPH INSTITUTE

Sentencing Director, my associates and I have had several months to observe and counsel Bentzy. This has allowed us to form a full understanding of Bentzy's personal circumstances, and how they contributed to his criminal conduct. We would like to share our conclusions with you, humbly hoping that they may assist you with your sentencing decision. The second is to share with you a program of rehabilitative community service, as a special condition of probation in lieu of incarceration, that we would be willing to facilitate (should the Court and US Probation deem our involvement appropriate).

We only advocate on behalf of individuals in whom we sincerely believe – those who have demonstrated genuine remorse and a willingness to make positive changes in their lives. In fact, we reject many requests primarily because many defendants are not willing to accept personal responsibility for themselves and for their offenses. We only advocate on behalf of defendants that have passed our screening process, and we do not accept any defendant whose offense involved violence or credible threats of violence. Additionally, the defendant must be a first-time offender.[2] The defendant needs to demonstrate, to our satisfaction, that he or she has accepted responsibility for their conduct, and that he or she has expressed remorse in a tangible way. Above all else, we advocate for an alternative sentence only after we are confident that the defendant does not pose a future threat to society. All our services are provided on a *pro bono* basis, motivated only by our sincere belief in the work that we do. We strive to inculcate the universal truths of moral and ethical behavior.

## A.     THE ALEPH INSTITUTE.

In 1981, The Lubavitcher Rebbe, Rabbi Menachem M. Schneerson, *may his merit shield us*, directed the establishment of The Aleph Institute as an organization to develop innovative programs related to criminal justice issues.[3] The organization was conceived by Rabbi Sholom D. Lipskar in the chambers of Judge Jack Weinstein of the U.S. District Court for the Eastern District of New York. We are extraordinarily grateful to our many supporters and we are particularly honored by what Judge Weinstein wrote about us following our inception:

> [T]he Aleph Institute, and [its] associates understand and force us to face the fact that each person deserves to be treated with respect as an individual personality and not as . . . a faceless number . . . . The Aleph Institute is doing extraordinary fine work. Its assistance to defendants and their families provide standards of compassion and aid worthy of emulation . . . . Aleph helps in three ways. First, it explains to judges and

---

[2] Excluding civil infractions, unless the infraction involved the same conduct at issue.

[3] Our history and our mandate are more fully explained in the attached Appendix A: *About Aleph*.

B"H



THE ALEPH INSTITUTE

the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those outside, particularly the children of prisoners, to retain their ties with prisoners. As a result of its good work, Aleph is widely known and respected by penal and judicial authorities.[4]

Aleph's work in the realm of criminal sentencing has been devoted to the development of effective alternative sentencing modalities.[5] Our many years of experience have taught us that, in certain cases, the goals of the criminal justice system can be accomplished by alternative means, without compromising the statutory imperative to promote criminal justice goals such as rehabilitation, retribution, deterrence, and incapacitation.[6] We are further guided by our ethical teachings which emphasize that every individual – no matter his shortcomings – naturally has a positive purpose to fulfill in the world.[7] We readily acknowledge that prison terms are often necessary as appropriate punishment for serious offenses and/or to protect the public from being further victimized by violent, predatory, or unrepentant offenders. Still, the courts have observed that "[i]ncapacitory sentences are usually unnecessary to increase public safety, or prevent recidivism; they place a tremendous financial burden on society through excessive incarceration."[8] And, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."[9] Every submission that Aleph enters in federal cases carefully considers the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with . . . correctional treatment in the most effective manner."[10] Moreover, in many varied cases and

---

[4] Jack B. Weinstein, Prison Need Not Be Mandatory: There Are Options Under the New U.S. Sentencing Guidelines, 1 JUDGE J. 16, 28 (1989).

[5] For more information about our efforts in this arena, we welcome you to review the attached Appendix C: Incarceration vs. Alternative Sentencing.

[6] E.g., Graham v. Florida, 560 U.S. 48, 71, 130 S. Ct. 2011, 2028 (2010) (citing Ewing v. California, 538 U.S. 11, 25, 123 S. Ct. 1179, 1187 (2003)) (plurality opinion) (the "goals of penal sanctions that have been recognized as legitimate [are] retribution, deterrence, incapacitation, and rehabilitation.").

[7] Talmud Shabbos 77b; Bereishis Rabba 44:1, 10:7.

[8] United States v. Rivera, 281 F. Supp. 3d 269, 271 (E.D.N.Y. 2017).

[9] Gall v. United States, 552 U.S. 38, 54, 128 S. Ct. 586, 599 (2007) (emphasis added) (quoting lower court order with approval).

[10] § 3553(a)(2)(A), (D).

B"H



THE ALEPH INSTITUTE

situations, we have assisted courts in fashioning a particularized sentence, "sufficient, but not greater than necessary," to comply with the purposes set forth in the relevant sentencing statute.[11]

We find that our sentencing philosophy is given excellent expression in these words from William Fitzpatrick, the former President of the National District Attorneys Association, who suggests that "that we use prison for those we are afraid of, not those whom we are mad at based on their behavior."[12]   In our experience, incarceration often inhibits defendants from fulfilling their potential, and devastates the family and community left behind, breeding bitterness, anger, insensitivity, and eventual recidivism.  Too many defendants "lose their claim to a future" when "lengthy prison terms" are imposed in place of "reasonable, innovative, and promising alternatives to incarceration."[13]  We strive to develop alternative sentencing proposals, and many of these proposals have been adopted by courts based on our recommendations.[14]  We have also received numerous, supportive comments on our work from some of the lawyers, judges, lawmakers, and scholars with whom we are joined in a vibrant community of stakeholders working to develop creative and effective approaches to criminal punishment that enrich defendants and their communities.[15]

## B.   BENZION ZIRKIND.

*Background.*

Benzion Zirkind ("Bentzy") is 23 years old.  He grew up in Montreal, Canada, in a home environment characterized by financial uncertainty and instability.  Supporting eight children (Bentzy has five brothers and two sisters), Bentzy's father, Mark ("Mendy"), struggled to provide for his family by pursuing a variety of often risky business ventures.  ***Bentzy describes his family's frantic and unstable financial state during his childhood as jumping from "high-highs" to "low-lows:"*** sometimes his father would close a big deal and treat the family to a spontaneous trip, while other times, the electricity in their home would be shut off due to nonpayment.  His mother, Hinda ("Hindy"), worked sporadically as a substitute teacher and sold homemade cookies to supplement the family's income.

---

[11] *Id.*

[12] April 26, 2016 letter to Senators Mitch McConnell and Harry Reid.

[13] *United States v. Dossie,* 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) (internal quotation omitted).

[14] *See* Appendix D: *Selected Successful Aleph Alternative Sentencing Cases,* attached, for descriptions of some alternative sentencing proposals that were adopted by courts based on our recommendations.

[15] *See* Appendix B, *supra*, note 1.



Bentzy's father Mendy had grown up without money and opportunity, and he wanted to give his children everything that he never had when he was growing up. Bentzy's parents did not think of the future and money was not saved, only spent, as Bentzy recalls *"[g]rowing up I did not learn financial discipline. I did not learn the value of money or the conflicting consequences."* There was also stress and insecurity caused by the family's financial uncertainty. Bentzy's brother Mottel describes how, especially during periods of financial difficulty, the children learned to make "small footprints" so as not to catch their father's attention.

Mendy and Hindy did their best to shield their children from these financial struggles, and Bentzy's siblings were blissfully unaware or simply confused about their family's financial reality based on the illusion of stability that their parents attempted to project. Yet Bentzy was a remarkably sensitive child, and he was deeply affected by his family's plight. Bentzy desperately sought love, affection, and validation from his parents, so he always made sure to be trustworthy and honest, and as a result, his parents confided in him more than his siblings. He was always careful to bring back exact change when his parents sent him to the grocery store, and he never asked to buy anything extra for himself. Even if his siblings begged and pleaded for an extra treat, Bentzy would quietly deflect their attention, always concerned for his family's welfare. The financial crisis of 2008 brought even more challenges, and Bentzy remembers that the family was struggling immensely when he turned 13 years old in 2010.

<u>Bentzy's Personal Challenges</u>.

When a boy becomes 13 years of age, it represents an important milestone in the Jewish faith, marked by the *Bar Mitzvah* celebration – when he becomes accountable for his own actions and after which he can participate in all aspects of Jewish community life. Bentzy's *Bar Mitzvah*, though, was markedly different from the celebrations of his brothers. Money was extra tight, and whereas all his brothers had been given lavish *Bar Mitzvah* celebrations, Bentzy's party was noticeably frugal. *As a young teen, a strong sense of inferiority began to affect Bentzy's self-esteem.* In school, his teachers would label their rambunctious redheaded student a "troublemaker" and a "bad kid," because he could not sit still or focus. Without treatment, Bentzy's condition only deteriorated. *He started believing all the negative labels projected upon him, and he considered himself a failure*.

*Although he is one of eight children, Bentzy often felt alone*. He came to believe that he was inferior to his siblings, and as a result, he was often sad and withdrawn.

B"H



THE ALEPH INSTITUTE

Despite trying his best to be a good son, brother and student, his labeling as an unruly child only added to his feelings of confusion and insecurity. Bentzy remembers coming home from school when he was in fourth grade, after being reprimanded by his teacher, and laying on his bed alone in his room in the dark until dinner time, deeply hurt by his teacher's words. When Bentzy's teachers commented on what they perceived as his lack of discipline, his parents told him that he needed to focus, but Bentzy could not understand why focusing was so difficult for him, leading to more feelings of helplessness. In 2014, when he was 17, Bentzy was diagnosed with Attention Deficit Hyperactive Disorder (ADHD). ***After becoming aware of this diagnosis, Bentzy began the process of more effectively managing his thoughts and emotions***. Bentzy is currently in therapy – he has forged a strong bond with his therapist, and he looks forward to achieving even more progress as he continues to receive guidance and support through his ongoing therapy.

### A Heart of Pure Gold.

Those who know Bentzy well describe him as the "young man with a flaming mane of red hair and a heart of pure gold." Although he has already faced some challenges in his young life, he is always eager to share his friendly smile and good-natured generosity with the world. ***Bentzy's extraordinary kindness is evident to all who know him.*** Countless friends, family members and acquaintances have shared that Bentzy is their "go-to" person, the one who will never say no to a request for a favor but just ask "when and where?" Yehudah Neuwirth, a longtime friend, recalls one of many moments where Bentzy stood out from the crowd for his kindness:

> "When I was younger, my parents threw a small party for the birth of my baby brother at the local synagogue. Afterwards Bentzy was there cleaning up the entire synagogue for hours all by himself. ***Not for anyone, not for money, but because he wanted to make sure that our congregation was how it should be, a proper place to respect and pray to G-d***."

Even as a young child, Bentzy had a special sensitivity to the plight of others, and he always sought ways that he could help.

In school, Bentzy had difficulty focusing on classes so he focused on helping people instead: ***"If someone forgot to bring food, Bentzion would give his food away, even if it meant that he himself would go hungry,"*** recalls Tzvi Raskin, a high school teacher, adding "If I needed any assistance physically in the building, he was always the first to volunteer, and was the first to always give a hand." Many of his other teachers echo Mr. Raskin's sentiments, describing Bentzy as the person they knew they could rely on to help, as Mordechai Wenger explains:



THE ALEPH INSTITUTE

> "The typical teenager doesn't have a difficult time challenging, and going beyond the rules. It is unique to find one that stands by his word, and commitments. I found in my interactions with Bentzy that he was one such person. When spoken to, he listened, and when he committed to something, he kept his word! He is one that understands when spoken to and can be relied on to fulfill his commitments."

Bentzy also helped others in his community. For many years, Bentzy volunteered at The Family Store in Montreal, which provides 60,000 weekly meals to underprivileged families in his local community.[16] Itchy Treitel, co-founder of The Family Store, recalls:

> "One time Bentzy and I were stacking the shelves together and a young mother and her 4 year son were shopping. We heard the little boy turn to his mother and say 'Ma look there is milk in the fridge does that mean I can have cereal and milk tomorrow for breakfast?' We both froze and I looked at Bentzy to see tears rolling down Bentzy's face."

***Bentzi's life is embodied by acts of selflessness and kindness.*** When he moved to New York, he had an opportunity to move in with a few roommates into a modern apartment. Instead, Bentzy chose to move in with his elderly grandmother who was living alone. He would often forgo parties and get-togethers with his friends so he could take his grandmother to her doctor appointments, take her on daily walks, or spend time talking to her and providing her with company and comfort. During this time, Bentzy's friend, Mendel Teitelbaum, was still living in his parents' basement in Montreal. Bentzy encouraged Mendel to move to New York and begin living independently, and Mendel eventually gathered the courage to follow Bentzy's advice, as Mendel explains:

> "I moved to New York, Bentzy himself was able to get me a job where he worked and I was happy, but then he also did much more than that, it was my first time living alone so I didn't know what I was doing really and for a while Bentzy invited me to his house every single night for dinner, and that was a huge help, I didn't know how to make much food on my own, and then every small thing about how to be an adult and live on your own ***I learnt from Bentzy, he literally pulled me out of my parents' home and helped me to change myself to be the normal functioning adult that I am today***."

Bentzy's friend Yossi Fogelman recalls, "There was one time I tried calling Bentzy that he was unavailable. He called me back several hours later, apologizing profusely. He was on the phone with a teenager who was considering taking his own life." Yossi

---

[16] www.themtc.com.



describes how "Bentzy talked this teenager out of it, and even convinced him to go to therapy. This teenager ended up flying to Israel, served in the IDF, and is now married with children."

Shmuly Schapiro, Bentzi's co-worker, writes how **"Bentzy is a very warm, giving, heartfelt person . . . Someone who would do anything for anyone,"** and provides the following example of Bentzi's kindness:

> "One day before coming into the office, Bentzy went out and bought a danish and coffee for everyone in the office.  So just as everyone came into the office by their desk they had a little something to start their busy day ahead . . . Last March when covid-19 hit our community hard my wife and I got sick with the virus. Bentzy . . . asked me what he can do to help with anything – shopping, running errands, or picking up things for shabbos. He did this at a time when no one knew anything about this virus and people were scared to go out. **But here was Bentzy ready to do a favor for anyone**."

Mendel Angyalfi, Bentzy's uncle, echoes those sentiments, saying: "I was looking for somebody to help, and I thought of Bentzy. When I asked him, without a second thought, he said: 'Sure, tell me when you need me.'"  These acts provide just a few examples of Bentzy's kindness.

<u>A Terrible Decision</u>.

When he was 21, Bentzy married his wife Leah, and started working various jobs to become financially stable.  Although his parents had failed to provide an effective role model for financial discipline, Bentzy was determined to work hard and to build an independent life. Yet very quickly, on his minimum wage salary, Bentzy found himself accumulating debts.  When a trusted family member offered him a job that would provide quick cash, Bentzy agreed. **Tragically, this decision would haunt Bentzy for the rest of his life.**

Having grown up in a home where cash was frequently appearing and disappearing, Bentzy thought his new job relatively normal, as he explains, "I was instructed to count the money and make sure it was the same amount as I was told it would be and then bring it to a different place and give it to someone . . . I was able to continue doing this and pay for groceries and clothes."  The family members he trusted told Bentzy that what he was doing was okay, that it was "Kosher," as he writes, **"While I was doing this, I wondered where the money was coming from and I asked my close family member who told me it was Kosher money. Which, against my better judgement, I**

B"H



THE ALEPH INSTITUTE

*accepted at the time even though I knew it had to be illegal because of all the secrecy involved*." Eventually, he recognized that he had trusted the wrong people, and he immediately stopped his activity. *He realized he had made a terrible decision that would have consequences for the rest of his life*.

<u>*Remorse, Regret and Transformation*</u>.

Since his arrest, Bentzy has undergone a process of profound introspection, and he has come to terms with the nature of his wrongful conduct and its consequences. He fully accepts responsibility for his actions, and he knows that he should blame only himself. *He is plagued by constant remorse, regret and sorrow*. Bentzy describes this painful process:

> "*At first, I denied it to myself. I gave myself every excuse as to why it is not my fault, I told myself if I had known I would not have done it*. I told myself I was robbed of my innocence and I did nothing wrong . . . *Along with this I got angry and resentful* . . . Then I got fired from my job due to the Covid-19 pandemic. I now had a lot of time on my hands and I started researching what this crime actually is. I started to learn about money laundering and drug trafficking . . . I learnt how it raises crime rates and hurts so many innocent people. *I sat down and started to realize what I had done.*"

When Bentzy discovered the true nature of his crimes, *he was broken by guilt and shame*. Having lost close family members and friends to drug addiction and suicide, Bentzy was heartbroken by the harsh reality that he had contributed to this cycle. Bentzy writes about the tragedies of addiction that have deeply impacted his life:

> "I thought of my old friend . . . the roommate of a relative of mine . . . He was kind and always had a smile on and we quickly became friends. A few months later I found out that [he] was suffering from mental illness and using cocaine instead of the proper prescribed drugs and one night while extremely intoxicated by drugs he put a shotgun in his mouth and used his toe to pull the trigger . . . I then thought about the friends I have who have been in and out of rehab. I thought about the ones who have overdosed. I thought about the families who were torn apart by drugs and the parents who lost children to addiction. I thought about the children who grew up in broken homes because a parent got addicted to something and had no way of stopping."

He also explains the tremendous guilt he feels for the consequences of his actions:

" . . . *I started to realize that some of this is my fault*. I realized that regardless of how much I wish the facts were different, and regardless of the role I played in this, I made those drugs available for [my friend] to take his own life. I was responsible, in part, for my cousin's overdose. *As I write this letter of remorse to Your Honor tears are running down my face, not because of what I did to my future and to my family, but because of the future of the families I do not know and because of those who now cannot have a future because of my actions and the decisions I made*."

Bentzy knows he made terrible decisions, and he is dedicated to making amends. This experience has triggered a painful reckoning that has brought him to therapy to help him heal from past wounds. A close uncle, Ezriel Schaffran, has stepped in as a father figure to guide Bentzy through this difficult period, and **Bentzy has channeled his remorse for productive action**. He has been volunteering for Neshamos, a nonprofit mental health advocacy organization that serves the youth in his community.[17] Bentzy writes:

"At first, I was told they help people with mental health issues. I quickly learned that helping the mentally ill was only a small part of what this organization did. As I spent several hours every day there, I understood that they helped a range of people. I began to help children, teens, and adults, who have a host of issues ranging from mental illness to drug addiction. I helped estranged parents cope with their plight. I helped children from broken homes. I helped parents with broken marriages. I helped teens battling addiction."

In a few short months, Bentzy has already made himself invaluable to the organization, directing his energy and passion into creating programs and educational opportunities for people struggling with mental health and addiction. Meir New, the co-founder of Neshamos, is profoundly grateful for Bentzy's volunteer work, as he writes:

"The work we do is helping people who are often at the depths of despair. **The passion and readiness that Bentzy has shown as well as the conversations we have had have led me to realize that Bentzy is a man of deep compassion**, with a passion to help people and make resources available to people who are suffering. He has done much more than we have expected from him, working late and pitching in to make the organization more streamlined. Personally, he has been a great source of moral support and has often acted as a calm baseline to myself. He was instrumental in organizing a community wide debrief and grief session

---

[17] www.neshamos.org.



THE ALEPH INSTITUTE

after the tragic suicide of a 24 year old girl.  His ideas and input in the organization have proven to be so valuable that we are currently entertaining hiring him to a part time position."

Bentzy is no longer the naive young man who blindly stepped into illegal activities by following the direction of family members. ***This experience has irrevocably transformed him***, and set him on a path of healing for himself and for others, as Bentzy's uncle Ezriel explains:

> "I know that if Bentzy is given a chance to continue his employment and the intense therapy that he is completely committed to and I am given the opportunity to continue to be the father figure in his life ***he will not reoffend***.  I don't state these as empty words of an uncle that is requesting understanding from you. ***I am saying this as someone that deeply cares of this wounded boy that was led down the wrong path in life by people that should have done better***."

With Ezriel's support, Bentzy finally has a chance to build a new life on the steady foundations of faith, honesty, and personal responsibility.

*Community Service Proposal*.

Throughout his life, Bentzy has been a generous and kindhearted individual.  As his family, friends and acquaintances have expressed, Bentzy gives selflessly of his time, his compassion, and most importantly, of his love. ***Bentzy has undertaken a painful but necessary journey of transformation, and he is committed to making amends for his crime***.  Bentzy is more aware than ever that he needs to make contributions to the world around him to make up for the damage caused by the crime he committed.  With his love of life and compassion for humanity, Bentzy has so much to give to the world.  He and his wife Leah look forward to starting a family, and Bentzy hopes to impart to his children the security and confidence that he never received as a child.  Bentzy hopes and prays to continue his trajectory of growth and transformation, and he is an exceptionally good candidate for an alternative sentence.

We believe that an intensive program of community service in lieu of incarceration would serve to promote the traditional prosecutorial goals of punishment, deterrence, and rehabilitation, while also addressing "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with . . . correctional treatment in the most effective manner," that is "sufficient, but not greater than necessary" to achieve the desired prosecutorial ends.  Together with Aleph's involvement and support, Bentzy's profound hope is to make amends by giving back

B"H

THE ALEPH INSTITUTE

to his community.  We propose the following program of community service for Bentzy:

    1.    <u>Volunteering with Neshamos</u>.

Bentzy will volunteer his time to Neshamos and help the youth in crisis.  He describes his work with Neshamos as follows:

> " We are now working on training teams who answer the helpline . . . vital because most people who call are just lost and have no one to turn to . . . [s]ometimes we pair them up with others going through the same thing so they can have a support group. We are also working on curriculums for schools and parents. Curriculums to teach teachers how to notice cries for help, to teach parents how to notice changes in children and when to seek professional assistance . . . We even have a podcast where we raise common but underdiscussed and often stigmatized issues, like addiction to substances, or addiction to gambling, or the loss of parents at a young age, or spouses of addicts and how it affects them, or warriors who fight mental illness every single day."

Bentzy can relate to the struggles these young people are facing.  ***Bentzy's work with Neshamos also allows him to make amends in a meaningful way***, as he writes, "***I felt this as a good atonement for my misdeeds seeing as my previous actions helped prey on those struggling with addiction and mental illness***.  I've made it somewhat of my life quest to focus each day on helping those same people overcome their issues.  It has been a truly humbling and eye-opening experience."  Bentzy's work with Neshamos has been so impactful that the organization is considering hiring him for a paying position.

    2.    <u>Volunteering with Heights and Hills</u>.

Bentzy will also continue to volunteer two hours per week with Heights and Hills,[18] a charity located in Brooklyn, New York, that provides support to the elderly and homebound – which is especially needed during the COVID-19 pandemic.  Bentzy borrows his in-laws' car every week to go shopping and deliver groceries to the elderly in his community during the pandemic.

---

[18] www.heightsandhills.org.



B"H

THE ALEPH INSTITUTE

    3.    <u>Therapy and Counseling</u>.

In addition to volunteering with Neshamos, Bentzy will continue to receive therapy twice a week.  Bentzy hopes that he may be able to continue to see his current therapist, with whom he has already established a strong relationship of mutual trust, and that the significant progress that he has already made will continue without interruption. Aleph will also provide Bentzy with weekly rabbinical counseling on ethical and spiritual matters.

Aleph stands ready to remain involved, as the Court sees fit, and has the experience and infrastructure to support Bentzy as needed.  Aleph would be pleased to facilitate and supervise Bentzy's community service program and would provide regular and detailed progress reports to the Court and to the Probation Office should the Court so instruct.

    C.    **<u>CONCLUSION</u>**

Bentzy feels intense remorse for his actions, as he explains. "I constantly relive the decisions that brought me to this, and I cannot believe I allowed myself to commit this crime. It saddens me to think of the hurt I have caused so many, the hurt I have caused my wife, my family, my friends, my community . . .."  His deepest wish is to make amends for his crimes by helping others in a truly meaningful way.

With the utmost respect and admiration for Your Honor's wise and compassionate decisions, I hope and pray that this submission will receive the consideration that will produce good results for Bentzy and for society.

Respectfully submitted,

/s/ Yossi Bryski

Rabbi Yossi Bryski
The Aleph Institute



# APPENDIX A

# ABOUT ALEPH

*No One Alone. No One Forgotten.*

## INTRODUCTION

Aleph was founded in 1981 in the chambers of the Hon. Jack Weinstein, then-Senior District Judge of the United States District Court for the Eastern District of New York, at the behest of the Lubavitcher Rebbe. Aleph provides direct supportive services for criminal defendants, incarcerated persons, and their families, in order to provide a light during some of the most trying times in their lives. Aleph also advocates on behalf of individual criminal defendants in limited circumstances, and regularly commissions amicus briefs promoting favorable policy changes. In the nearly 40 years since its inception, Aleph has gained substantial experience and insight in the area of alternative sentencing.

Sentencing proposals prepared by Aleph are designed to mete out appropriate, substantive punishment with the greatest benefit and lowest cost to society, while redirecting and enhancing an individual's value structure through social, therapeutic, and moral counseling and education. Every proposal Aleph submits to the federal courts carefully considers the factors outlined in 18 U.S.C. §3553(a) including, but not limited to, "the history and characteristics of the defendant," id. §3553(a)(1), and the legislative directive to provide, "correctional treatment in the most effective manner." *Id.* at §3553(a)(1)(D). Moreover, we have, in hundreds of varied cases and situations, worked to assist courts in fashioning a particularized sentence, "sufficient, but not greater than necessary," to comply with the purposes set forth in the relevant sentencing statute. 18 U.S.C. §3553(a).

Aleph maintains certain parameters that must be satisfied before it will advocate for a defendant with regard to sentencing: the offense of conviction must not involve actual use of predatory violence; the defendant must accept responsibility for his or her conduct and express genuine remorse; and we must be confident that the defendant does not pose a future threat to society.

Judge Weinstein described Aleph as follows:

> [T]he Aleph Institute…understands and forces us to face the fact that each person deserves to be treated with respect as an individual personality and not as…a faceless number…The Aleph Institute is doing extraordinary fine work. Its assistance to defendants and their families provide standards of compassion and aid worthy of emulation…
>
> Aleph helps in three ways: First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those outside, particularly the children of prisoners, to retain their ties with prisoners. As

a result of its good work, Aleph is widely known and respected by penal and judicial authorities.[1]

The Honorable Joy Flowers Conti, Chief District Judge of the United States District Court for the Western District of Pennsylvania, has noted, "You at Aleph are doing extraordinary things on behalf of the judges in my court. We appreciate the work that you do." (Address to the Pittsburgh Chaplains Conference, November 19, 2014.)

Our many years of experience have taught us that, in certain cases, the goals of the criminal justice system can be accomplished by alternative means. Motivated by that belief, we have endeavored to become a resource to those seeking reform of the criminal justice system, and in particular, alternative sentencing.

## PHILOSOPHY

Since inception, Aleph has developed institutional expertise with various sentencing modalities. In analyzing the nature and form of sentencing, Aleph has developed the view that custodial sentences should be reserved for predatory individuals as well as individuals that pose a significant or ongoing danger to society. We agree with William Fitzpatrick, the former President of the National District Attorneys' Association, who suggests that society "use prison for those we are afraid of, not those whom we are mad at based upon their behavior."[2]

Aleph's perspective on sentencing is based on these convictions and supported by a consensus of social scholars and legal academics that study penal policy. For more on the relative merits of alternatives to incarceration, please see Appendix C.

## ROLE

Our extensive experience has taught us that many of the goals of the criminal justice system can often be accomplished through alternative means. Motivated by that belief, Aleph endeavors to become a resource to those seeking reform of the criminal justice system, and in particular, alternative sentencing. We often advocate for sentences that include an alternative, non-custodial component. The non-custodial nature of the sentence allows individuals to directly address the shortcomings within themselves that led to their offense and give them an opportunity to use their conviction as a conduit to improve the world around them.

In our role as advocating for a better approach to sentencing, we believe it is imperative to regularly bring thought leaders together with judges and prosecutors to discuss the sentencing framework. Over the past few years, we have held two conferences that focused on alternatives to incarceration.

---

[1] Jack B. Weinstein, *Prison Need Not Be Mandatory: There Are Options Under the New U.S. Sentencing Guidelines*, 1 Judge J. 16, 28 (1989).
[2] April 26, 2016 letter to Senators Mitch McConnell, Senate Majority Leader, and Harry Reid, Senate Minority Leader.

In March 2016, we organized and hosted a symposium at Georgetown Law School, the Alternative Sentencing Key Stakeholders Summit ("ASKS Summit"). Building on the success of the ASKS summit, we hosted another summit, Rewriting the Sentence, in June 2019 at Columbia Law School. The Rewriting the Sentence summit convened more than 400 judges, prosecutors, defense counsel, probation and pretrial officers, individuals directly affected by incarceration, advocacy groups, and other key stakeholders in the criminal justice system to examine the tremendous culture change taking place in the alternatives to incarceration arena. The summit highlighted an array of alternative approaches to criminal justice currently isolated in pockets throughout the country and brought together leaders of innovation in the field to broadcast best practices and ideas for further implementation of alternatives. The Federal Judicial Center sponsored a cohort of federal judges from all over the country to attend the summit.

Some 80 speakers were featured over the two-day convening, including: a panel of reform-minded newly elected DAs, highlights of innovative practices nationwide, and panels on restorative justice, the role of mercy in our system, the merits of risk assessment tools, pretrial justice, and other hot topics in justice reform. Speakers who imparted their views on criminal justice policy relating to incarceration included Hon. New York State Attorney General Letitia James; Congressmen Hakeem Jeffries of New York and Doug Collins of D.C., who championed the recently passed First Step Act; Hon. State's Attorney Marilyn Mosby of Baltimore, MD; Hon. Virginia Phillips, Chief U.S. District Judge for the Central District of California; Hon. Rodney Ellis, Commissioner of Harris County, TX; Hon. Esther Salas, U.S. District Judge for the District of New Jersey; Hon. Leo Sorokin, District Judge for the District of Massachusetts; Vincent Schiraldi, Co-Director of the Columbia Justice Lab; Hon. Larry Krasner, District Attorney of Philadelphia; Hon. Nancy Gertner, Professor of Law at Harvard Law School and former District Judge for the District of Massachusetts; Matthew Charles, a fellow at FAMM and the first beneficiary of the First Step Act; and Representative Roger Goodman, Chair of the House Public Safety Committee of the Washington State Legislature. A complete list of speakers is available at www.rewritingthesentence.org/agenda.

Also at the conference, Aleph formally announced the formation of the Center for Fair Sentencing, a clearinghouse that hosts a digital portal on alternatives to incarceration. The Center will bind together the community of stakeholders exploring or exemplifying the best practices in alternative programs; provide data and analysis; lift up examples of programs using data-informed approaches and best practices; publish turnkey guides, such as one for establishing alternative programs; proffer policy white papers and reports; and advocate for expansion of the use of non-custodial approaches throughout all stages of the criminal legal system. As a result of the 2016 and 2019 conferences, we have been able to collect critical data in helping us prepare the recommendation that we are providing in this situation.

In addition, Aleph regularly pursues executive clemency for individuals. Most recently, Aleph successfully lobbied the Trump administration to commute the sentences of two individuals. The first, Rabbi Sholom Rubashkin, was serving a 27-year sentence imposed as a result of a raid on his kosher meatpacking plant that uncovered irregularities. The second is Ronen Nahmani, who was serving a 20-year sentence for selling a synthetic marijuana analogue product at a time when the status of the substance was legally fluid. While Ronen was languishing in prison for what was

essentially a regulatory offense, his five young children were on the verge of becoming orphans as his wife was suffering from an aggressive form of breast cancer with a poor prognosis.

Aleph was also one of several organizations who participated in the drafting of The First Step Act, Pub. L. No. 115-391 (2019).  Aleph's input was instrumental in adding non-violent financial offenders to the category of persons eligible for relief under the statute.

## BASIS OF PHILOSOPHY

At a fundamental level, we center our work on the belief that, as Rabbi Schneerson, *of blessed memory*, said: "Our souls cannot be broken that they should need repair, nor deficient that they should need anything added. Our souls need only to be uncovered and allowed to shine." We start from the premise that the individuals in the criminal justice system are, first and foremost, human beings in need of rehabilitation and reform. We inevitably arrive at the conclusion that the system needs to fundamentally change and more compassion should be shown. The current mindset that incarceration is the default for malfeasance is failing society and the individual; the objective should be restorative justice. The Bible's code of civil law mandates the establishment of courts of justice to judge and sentence lawbreakers. However, prison is conspicuously absent as a form of punishment. This is based on the Torah principle that everything in the world was created by G-d for a positive purpose and that every individual, no matter their shortcomings, has a mission to fulfill.[3]

## SELECTING CLIENTS

We infuse this philosophy through every case that we accept. Our advocacy is deeply rooted in our conviction that incarceration should not be used as a default punishment absent a compelling need. We are selective in the cases that we take on. Our criteria include the following:

· The potential client is not charged with an offense of a predatory nature, a sex offense, or arson.

· The potential client expresses clear and genuine remorse.

We are extremely careful in identifying cases that are especially amenable to alternative approaches, and we strive to ensure that our submissions carefully consider the factors outlined in 18 U.S.C. §3553(a), with a particular focus on the legislative directive to "provide the defendant with...correctional treatment in the most effective manner."[4] Aleph provides all services *pro bono* and we do not accept any payment or remuneration. Rather, Aleph tries to assist courts in fashioning particularized sentences that are "sufficient, but not greater than necessary" to comply with the purposes set forth in the relevant statute.[5]

---

[3] Talmud Shabbos 77b; Bereishis Rabba 44:1, 10:7.
[4] 18 U.S.C. §3553(a)(2)(A), (D).
[5] *Id.*



**Appendix B**

# Comments on Aleph and Alternative Sentencing



Over the past decades, Aleph has received incredible support and commendation from current and former members of the federal judiciary, for which we are extraordinarily grateful. Below are several comments from the judiciary about Aleph and alternative sentencing:



"Rabbi Sholom Lipskar, the guiding force of the Aleph Institute, and his associates understand… that each person deserves to be treated with respect as an individual personality and not as…as faceless number. The Aleph Institute is doing extraordinary fine work. Aleph helps in three ways. First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those on the outside, particularly the children of prisoners, to retain their ties with prisoners. As a result of its good work, Aleph is widely known and respected by penal and judicial authorities"**—Hon. Jack B. Weinstein of the U.S. District Court Judge for the Eastern District of New York, Eastern District of New York**



"Aleph historically has upheld the goals of sentencing by urging prudence to protect society, and humanity to recognize that it is people we are sentencing." **—Former Attorney General and Chief Judge of the United States District Court for the Southern District of New York, Michael B. Mukasey**



"For over 35 years Aleph has been championing and delivering justice to people who have been overlooked or forgotten by the rule of law, giving them hope, relief from suffering and the chance to improve their lives and fortunes. Both these individuals and the Nation are the beneficiaries of Aleph's goodness and mission."**—Former Director of the FBI, Louis Freeh**



"We need to prove going forward what I know in my bones is the truth, which is, these [alternative sentences] work, just as they worked in the states. And they put a human face on a criminal justice system that, for the last 25-30 years, is so desperately in need of a little humanity. This is the right thing to do."— **Hon. John Gleeson, former District Judge of the United States District Court for the Eastern District of New York (ret.), speaking at an alternative sentencing summit that Aleph hosted.**





"The opportunity to work as a conviction and sentence alternative (CASA) judge is the most rewarding thing I have ever done. I have been a judge since 1991, but the ability to sit down face to face, without our robes, and listen to the stories of the defendants, their day to day struggles… has been a very sobering but enriching experience. Their car breaks down, they can't get to work, then they are evicted, then their kids are taken—something as simple as a car breakdown can start this chain of events. People who are living so close to the edge, even when they are trying very, very hard, it doesn't take much to send their lives into a downward spiral."**—Hon. Virginia Phillips, Chief U.S. District Judge, California, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"While judging, in general, requires the application of law to the facts, sentencing requires more. It necessarily involves empathy and compassion, which Aleph surely brings to the table. **At a time when sentencing principles are changing, Aleph's input is invaluable.** It provides careful analysis of alternatives to incarceration entirely consistent with – and some may say better suited to – public safety. It provides a critical link between prisoners and their families and friends, making certain that prisoners – human beings – do not disappear behind the walls. Put simply, Aleph brings to bear its reservoirs of compassion and empathy, both before during and after punishment has been imposed, and has been doing so for 35 years; The men who [I sentenced years ago and] I am following now, their stories are simply extraordinary. The time lost in their lives, the families that have disintegrated because they were put in a prison in the middle of the country, the relationships that they may have had, that were not fabulous to begin with, but at least were something. We have to talk about what do we do to repair these communities."**—Hon. Nancy Gertner, Judge, United States District Court of Massachusetts, Ret., and Professor at Harvard Law School**



"I think we are all in agreement this has been an extraordinary summit….35 years ago, a young Rabbi started some educational institutions, believing… that education was a fundamental right and goal of all people. He also had an interest—because of faith, belief and experience—that reforms could be made in the criminal justice system; to deal with defendants more humanely, to be aware of the impact on families, [and] the problem of reentry, and he started an institution to deal with these problems. Today we are the beneficiaries of that vision and that work."**—Judge Charles B. Renfrew, United States Deputy Attorney General and Judge, United States District Court, Northern District of California**





"The Aleph Institute must be commended for its vision in bringing together at the ASKS Summit such diverse and interesting people and perspectives on the questions of criminal justice reform and sentencing alternatives in this era of mass incarceration."**—Chief Magistrate Judge Brooke Wells, United States District Court, District of Utah**



"You at Aleph are doing extraordinary things on behalf of the judges in my court. We appreciate the work that you do."**—Hon. Joy Flowers Conti, Chief District Judge of the United States District Court for the Western District of Pennsylvania**



"Today judges and lawyers, prosecutors and law enforcement communities…are engaged in trying to make certain that our system is fair. It takes a collaborative partnership and that's why I am so glad that all of us are here committed to making certain our justice system is the best that it can be. And I thank [Aleph] for being here. And I thank you for your continued great work."**—Hon. Bernice Donald, United States Circuit Judge for the Sixth Circuit**



"The many problems in our system cannot be addressed by simply building more prison beds. One of the keys of an effective Department of Corrections will be…great emphasis on alternatives to incarceration. Organizations such as the Aleph Institute will be key to any community-based programs." **—Lawton Chiles Former Governor, FL**



"Very impressive. I have reviewed countless alternatives during my years on the bench. This is one that is realistic."**—Hon. Thomas E. Scott, Former United States District Court Judge for the Southern District of Florida, in reference to an Aleph alternative sentencing proposal**





"[Criminal Justice reform] is hard work and even if we do it thoughtfully, and with the openness and humanity it requires, there will inevitably be setbacks and disappointments…But it is work that draws its sustenance from the divine spark in each of us. I commend Aleph for its decades of commitment, and for convening such an impressive group of people and organizations**."—Hon. Jeremy Fogel, Former Director of the Federal Judicial Center, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"When we approach alternatives to incarceration, we need to think about...the individuals, the population we're dealing with and [to] remember that sometimes just a little compassion, just a little time makes all the difference."**—Hon. Esther Salas, U.S. District Judge, New Jersey, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"When you send a person to prison, you send his or her family to prison with them."**—John Creuzot, District Attorney, Dallas County, Texas, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"Our bench [is] thinking about sentencing in a more meaningful way...we are seeing a positive element as a result of that…We are employing alternatives. We are reducing the amount of people receiving custodial terms, overall lowering the amount of time that we are imposing terms of sentence… lowering terms of supervised release and probation…You can see by our rearrest rates, these numbers have dropped in the past five years. And likewise, when we are talking about post-conviction outcomes and revocation, ours is well below the national average."**—Mark Gjelaj, Deputy Chief U.S. Probation Officer, Eastern District of New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"I think the place where we need to start thinking about a paradigm shift is where the concepts of atonement and forgiveness interact."**—Paul Fishman, Former U.S. Attorney, New Jersey, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**





"For me, success looks like changing the focus of our work as crime fighters, from strictly prosecution and punishment to prevention."**—Cyrus Vance, District Attorney, Manhattan, New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"The justice system, as you know, was meant to correct behavior and to keep our community safe, not simply penalize individuals. But unfortunately, and misguidedly, the evolution of the system made it one that's heavy on punishment, devoid of basic human dignity, light on rehabilitation, hostile to reform, and even lighter on transparency. We have witnessed that system go horribly wrong."**—Hon. Letitia James, Attorney General, New York, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"We have a duty to be aware. As a prosecutor, we are the ones who decide what sentence recommendations will be made to the court. It is incredibly important to understand and be aware of the reality of the sentences we help impose. We have to remind society of rehabilitative solutions."**—Hon. Marilyn Mosby, State's Attorney, Baltimore, Maryland, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School**



"Rehabilitation and recovery are no longer dirty words."**—Chuck Grassley, Senior U.S. Senator, Iowa, at Aleph's 2016 ASKS Summit, Georgetown University Law Center**



**Appendix C**

# Incarceration vs. Alternative Sentencing



# **Overview**

We recognize the sobering and complex task judges undertake in crafting criminal sentences, well expressed by Judge Denny Chin (writing for the United States Court of Appeals for the Second Circuit): "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal citations and quotation marks omitted).

When sentences are crafted to mete out **appropriate, substantive punishment with the greatest benefit and lowest cost to society**, while redirecting and enhancing an individual's value structure through social, therapeutic, and moral counseling and education, results have shown to be substantial and meaningful, leading to hundreds of successful rehabilitative outcomes.

The United States's prevailing method of sentencing, which uses incarceration as a default, has staggeringly high economic and social costs, **as well as a colossal social cost on the defendant's family**. The total cost of incarceration is approximately $1 trillion annually, which approaches six percent of GDP and is 11 times larger than corrections spending alone. The social cost is more difficult to measure, but the literature describes myriad problems related to incarceration, especially the effect of parental incarceration. Specifically, research shows that children of incarcerated parents demonstrate maladaptive symptoms, including behavioral problems, difficulties at school, depression, and an increased risk of winding up in prison themselves.

Two-thirds of federal judges responded to a survey in 1996 saying there ought to be alternative to incarceration programs. DOJ supports them. FJC supports them. The ABA, Right on Crime, and organization across the political spectrum support them.

Our nearly four decades of experience assisting the courts in this arena have taught us that, in certain cases, many of **the goals of the criminal justice system can be accomplished by alternative means and at little or no cost to the Government, especially when Aleph is involved**. The reason why thoughtfully crafted alternative sentencing plans work is best articulated by the Hon. John Gleeson, former District Judge of the United States District Court for the Eastern District of New York (ret.), speaking at an alternative sentencing summit that Aleph hosted at Georgetown Law School:

> "We need to prove going forward what I know in my bones is the truth, which is, these [alternative sentences] work, just as they worked in the states. And they put a human face on a criminal justice system that, for the last 25-30 years, is so desperately in need of a little humanity. This is the right thing to do."



This perspective on sentencing is supported by a consensus of the social scholars and legal academics that study penal policy. A survey of the literature on the subject reveals that lengthy prison sentences do not further any legitimate penological goals other than mere punishment—and even that is contested. In fact, the National Institute of Justice has concluded that **"long prison sentences do little to deter people from committing future crimes"** (William Fitzpatrick, a former President of the National District Attorneys' Association, April 26, 2016 letter to Senators Mitch McConnell and Harry Reid). *See also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("There is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs.")

Furthermore, the NIJ explains that:

> …compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects.[1]

There is also a significant financial cost associated with incarceration. The individual is removed from society and not able to earn a living or pay taxes. Society's net loss is compounded because, according to the United States government, the fee to cover the average cost of incarceration for Federal inmates was $34,704.12 ($94.82 per day) in FY 2016 and $36,299.25 ($99.45 per day) in FY 2017.[2] The financial cost of incarceration is another reason that we seek to create alternative sentences that allow defendants to be able to contribute to society instead of being clothed, housed, and fed by the government.

In addition to these individual and community considerations, "the consequences of incarceration on family members are numerous and they place already fragile families at increased risk."[3] "Research suggests that the children of incarcerated parents are among the most at-risk, yet least visible, populations of children. Parental incarceration serves as a significant risk factor for a host of negative consequences, particularly with respect to emotional and behavioral factors, physical care and custody, and contact with the parents."[4] Thus, whenever a court sentences an individual, it is not a stretch to say that it sentences an entire family, and the children of incarcerated individuals will suffer a permanent scar.

---

[1] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence*, last Modified June 6, 2016 &lt;https://nij.ojp.gov/topics/articles/five-things-about-deterrence&gt;.

[2] U.S. Department of Justice, Bureau of Prisons, Annual Determination of Average Cost of Incarceration, THE FEDERAL REGISTER, Vol. 83, No. 83, 18863 (4/30/18).

[3] Kolina J. Delgado, *The Impact of Incarceration on Families: A Summary of the Literature*, WRIGHT STATE UNIVERSITY CORE SCHOLAR: PSYCHOLOGY at 14 (2011) <https://corescholar.libraries.wright.edu/psych_student/5>.

[4] *Id*. at 9 (internal citations omitted).



Aleph's family services department has personally witnessed the painful reality of the children of inmates who have attempted suicide or turned to drugs. Tragically, in the case of one family with whom Aleph was involved, one of the daughters whose father received a lengthy prison sentence for a financial crime committed suicide last year.

Obviously, alternative sentences must carefully consider the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with… correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A), (D). Moreover, sentences should be "sufficient, but not greater than necessary" to comply with the purposes set forth in the relevant sentencing statute. *Id.*

# On Crafting an Alternative Sentence

An alternative sentence can be crafted to directly address the crime that brought an individual into the criminal justice system. An individual who, for example, must serve the community that he or she has wronged, or must use his or her strengths to support those who need help, **may have a truly redemptive experience that leads to rehabilitation if given the opportunity**. That is why in appropriate cases, sentences that favor an alternative, non-custodial component that keeps them with their families and in their community, with a mandate to directly address the root causes and inevitable consequences of their offense, allows individuals to consider their personal shortcomings that led to their offense, and **gives them an opportunity to improve themselves and the world around them, while also savings their family's fate**.

Therefore, we strive to construct corrective roadmaps that are designed to (i) confer a benefit on society as a whole, (ii) show the American people the proportional punishment associated with violating American society's standards and (iii) ensure that the individual is held accountable so as to prevent recidivism. We do not want to punish someone so extensively and create undue burdens or hardships on innocent people like young children. In our experience, lengthy periods of incarceration in cases where the individual does not present a danger to society unnecessarily inhibit defendants from fulfilling their potential, and devastate the family and community. The unintended consequences of such devastation breed bitterness, anger, insensitivity, and a greater chance of recidivism and multi-generational dysfunction. Too many defendants "lose their claim to a future" when "lengthy prison terms" are imposed in place of "reasonable, innovative, and promising alternatives to incarceration."[5]  Individuals can only be of full service when they have the freedom to act with their own accord. Prisoners are denied the opportunity to serve in this manner and improve by means of their own free will.

Aleph believes that prison should be used sparingly, primarily when it is necessary to protect the public from violent or predatory individuals. Rather than being strictly punitive, criminal punishments should be designed to confer a benefit on the victims of the offense, society as a whole, and the perpetrator.[6]  As such, our ethical convictions and experience lead us to believe

---

[5] United States v. Dossie, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) (internal quotation omitted).

[6] Talmud Berachos 606b; Likutei Torah Nasso.



that the best way to address lawbreakers who do not pose an active threat to society is to address both the root causes and the necessary consequences of their offenses. It is vital to keep people with their families in their community and productively contributing to society in order to effectively address their actions while ensuring that others do not needlessly suffer.

In formulating the Alternative Sentence proposal in this case, Aleph's team of legal specialists have carefully reviewed the factors outlined in 18 U.S.C. § 3553(a), especially the requirement that criminal sentences consider "the history and characteristics of the defendant," and the legislative directive to "provide the defendant with… correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A), (D).



**Appendix D**

# Selected Successful Aleph Alternative Sentencing Cases



We at Aleph are deeply grateful to have had the honor of submitting numerous alternative sentencing proposals to federal and state judges and prosecutors around the county, helping the judiciary secure hundreds of successful rehabilitative outcomes. Below are a handful of examples:

# 1.

In December 2018, Judge Joseph F. Bianco accepted in part a proposal submitted by Aleph, significantly reducing a defendant's custodial sentence in exchange for time served in a rehabilitation facility to treat a gambling problem. Aleph's mental health and legal experts determined, and the Court agreed, that the defendant's gambling addiction had been a major motivator in his criminal behavior. *See United States v. Barkany*, Case No. 13-CR-362 (E.D.N.Y.). Under the guidelines, the defendant was facing as much as 295-365 months. Aleph worked intensively with the defendant, helping him get the psychological evaluation he needed to enroll in the program and providing critical support to him and his family.

# 2.

In another successful case, a physician was convicted in the Western District of Pennsylvania for offenses related to the improper prescribing and dispensing of controlled substances. His guideline range, as accepted by the court, called for four years of imprisonment. After multiple interactions, Aleph's mental health and legal experts determined that the defendant was truly remorseful and that he had suffered sufficient punishment in the form of the tremendous collateral consequences stemming from his conviction, including personal shame, public humiliation, and the loss of his license to practice medicine. Aleph suggested that an alternative, non-custodial sentence was appropriate. The court accepted Aleph's recommendation and sentenced the defendant to a two-year term of probation, during which he was required to perform hundreds of hours of community service, some of which was facilitated by Aleph. The defendant successfully completed his sentence and has not reoffended or caused any further harm to society. *See United States v. Barnett*, Case No. 2:16-cr-153-JFC (W.D.P.A. 2017).

# 3.

In another recent case, we helped a young man in his early twenties who was facing one to five years in prison for trafficking marijuana. Aleph's mental health and legal experts determined that he was naive and impressionable and didn't fully understand the consequences of his actions. Aleph also learned that he had become more observant in the years leading up to his offense, but that he had turned away from his faith after a year in which he faced a difficult breakup, a serious car accident, and a financial setback. Aleph proposed that he be placed into an unconventional diversion program, in which he would take on extensive religious study, which would be



supervised by Rabbis at Aleph. The judge agreed to this proposal and treated the case like a standard diversion program, imposing neither jail time nor probation. She agreed to personally supervise the young man's progress for three years but planned to rely on Aleph for day-to-day monitoring and quarterly reports, which we continue to provide. *See State v. David Ian Alper*, Case No. CR19-0423 (Second Judicial District, State of Nevada 2019).

## 4.

A teenager who was suffering with severe depression and drug addiction for most of his adult life was facing felony charges following an arrest. Aleph was able to secure for him a place in a pilot diversion program that provided an alternative to incarceration. This program gave him housing and the intensive mental care that he needed to ultimately be a productive member of society. To date his progress reports have been outstanding. The built in support has enabled him to stay clean, to thrive mentally and emotionally, and to exceed the courts expectations for his success. *See People v. Gutnick*, Case No. LAXSA100756-01 (Superior Court of California, County of Los Angeles 2019).

## 5.

A young woman was involved in a company that sold binary options with misleading sales tactics. She was facing several years in prison but had unique health challenges which made the possibility of a lengthy incarceration substantively more onerous. The woman showed extreme remorse for her actions, and had already taken action to make amends by beginning to volunteer in a nursing home for upwards of twenty hours per week. Aleph presented the woman's unique circumstances to the judge and proposed that she pay for her crime with house arrest and continues community service. The judge sentenced her to only four months of incarceration, to be followed by four months of house arrest and the proposed community service. *See United States v. Shira Uzan*, Case No. 8:18-CR-608 (District of Maryland. 2019).